| STATE OF TENNESSEE<br>24th JUDICIAL DISTRICT<br>CIRCUIT COURT | **SUMMONS** | CASE FILE NUMBER<br>4675 |
|---|---|---|
| **PLAINTIFF**<br><br>CENTRAL BANK | **DEFENDANT(S)**<br><br>CHRIS JERROLDS and BERKSHIRE HATHAWAY HOMESTATE INSURANCE COMPANY d/b/a THE KANSAS BANKERS SURETY COMPANY | |

| TO: BERKSHIRE HATHAWAY HOMESTATE INSURANCE COMPANY<br>d/b/a THE KANSAS BANKERS SURETY COMPANY<br>C/O TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE<br>ATTN: SERVICE OF PROCESS<br>500 JAMES ROBERTSON PARKWAY<br>NASHVILLE, TN 37243-1131<br><br>**DEFENDANT'S COPY**<br><br>List each defendant on a separate summons. | Method of Service<br>☐ Certified Mail<br>☐ Hardin Co. Sheriff<br>☑ *Comm. of Insurance<br>☐ *Secretary of State<br>☐ *Out of County Sheriff<br>☐ Private Process Server<br>☐ Other<br>*Attach Required Fees |
|---|---|

YOU ARE HEREBY SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CIRCUIT COURT, HARDIN COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff:<br>(Name, address & telephone number)<br><br>James A. DeLanis (BPR # 6057)<br>Joshua A. Mullen (BPR# 28388)<br>Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>211 Commerce Street, Suite 800<br>Nashville, Tennessee 37201<br>615-726-5600 | FILED, ISSUED & ATTESTED June 19, 2014<br><br>Diane Polk / Karla Cromwell cc<br>**Diane B. Polk, Clerk**<br>Hardin County Courthouse<br>465 Main Street<br>Savannah, TN 38372<br><br>Deputy Clerk |
|---|---|

### NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date, or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | |
| | **Sheriff** |

***Submit one original plus one copy for each defendant to be served



N ALP 1338144 v1
2923226-000002  06/18/2014



## IN THE CIRCUIT COURT FOR HARDIN COUNTY,
## TENNESSEE TWENTY-FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| **CENTRAL BANK,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**CHRIS JERROLDS** *and* )<br>**BERKSHIRE HATHAWAY HOMESTATE** )<br>**INSURANCE COMPANY D/B/A** )<br>**THE KANSAS BANKERS SURETY** )<br>**COMPANY,** )<br>)<br>**Defendants.** ) | No. 4675<br><br>JURY DEMANDED<br><br>FILED 19th DAY OF June 2014 AT 2:15 AM/PM<br>DIANE POLK, CLERK<br>BY: Karla Cromwell D.CLERK |

## COMPLAINT

Plaintiff Central Bank files suit against Defendants Chris Jerrolds ("Jerrolds") and Berkshire Hathaway Homestate Insurance Company ("Berkshire"), and for its causes of action states:

### I. PARTIES AND JURISDICTION

1. Plaintiff Central Bank ("Central") is a Tennessee bank, authorized, organized, and chartered by the State of Tennessee. Its principal place of business is located at 485 Wayne Road, Savannah, Tennessee, 38372, in Hardin County, Tennessee.

2. Chris Jerrolds is a citizen and resident of Hardin County, Tennessee. Jerrolds is the former Chief Executive Officer and President of Central. He resides at 70 College Street, Savannah, Tennessee 38372.

3. The Kansas Bankers Surety Company ("Kansas") was a corporation that formerly existed under the laws of the State of Kansas with a statutory address of 1220 SW Executive Drive, Topeka, Kansas 66615 and was a wholly owned indirect subsidiary of Berkshire Hathaway, Inc., a Delaware Corporation.

1

N JAM01 1337567 v6
2923226-000002 06/18/2014

4.  Berkshire is a corporation existing under the laws of the State of Nebraska with a statutory address of 3333 Farnam Street, Omaha, Nebraska, 68131. Berkshire is a wholly owned indirect subsidiary of Berkshire Hathaway, Inc., a Delaware Corporation. The sole shareholder of Berkshire is Berkshire Hathaway Life Insurance Company of Nebraska. Service of process for Berkshire may be served to Thomas J. Mortland, Berkshire Hathaway Homestate Insurance Company, Suite 300, 3333 Farnam Street, Omaha, Nebraska, 68131.

5.  On or about December 11, 2013, the board of directors of Berkshire and the board of directors of Kansas determined and agreed that it was in the best interests of those companies to merge Kansas with and into Berkshire, with Berkshire being the surviving company in accordance with the Nebraska Business Corporation Act. On or about December 11, 2013, Sandy Praeger, Commissioner of Insurance for the State of Kansas, signed an Order of Merger that approved the merger as described above. Pursuant to that merger, Berkshire has assumed all liabilities and debts of Kansas, including the causes of action brought in this lawsuit.

6.  Before the merger of Kansas into Berkshire, Kansas underwrote and/or sold insurance, fidelity bonds, and/or surety bonds to community banks throughout Tennessee, including to Central. Kansas purposefully availed itself of Tennessee law and the jurisdiction and venue of this Court by selling these policies and/or fidelity bonds into the State of Tennessee, including Hardin County, Tennessee. Kansas sold its insurance to Central, which is located in Hardin County, Tennessee.

7.  Berkshire is now in the business of selling and/or underwriting insurance, fidelity bonds, and/or surety bonds to community banks throughout Tennessee, including to Central. Berkshire has purposefully availed itself of Tennessee law and the jurisdiction and venue of this Court by selling these policies and/or fidelity bonds into the State of Tennessee, including

Hardin County, Tennessee. Berkshire sold its policies and/or fidelity bonds to Central, which is located in Hardin County, Tennessee, as recently as June 2014. Berkshire does business with Central under the d/b/a name of The Kansas Bankers Surety Company. Berkshire is responsible for all liabilities of Kansas and for all claims brought against Kansas pursuant to policies issued by Kansas. For ease of reference, Kansas and Berkshire are collectively referred to as Kansas.

8. This Court has jurisdiction over these causes of action and over all of the parties to this action. Venue is appropriate in this Court, pursuant to Tenn. Code Ann. §§ 20-4-101, 20-4-102, and 20-4-106, and otherwise pursuant to Tennessee law, because the causes of action involved in this case arose or accrued in Hardin County, Tennessee; the injuries at issue arose in Hardin County, Tennessee; Defendant Jerrolds resides in Hardin County, Tennessee; Defendant Kansas sold its fidelity bond and investigated claims under that fidelity bond in Hardin County, Tennessee; and the facts otherwise support venue in Hardin County.

## II. GENERAL NATURE OF THE CASE

9. This is a suit for damages that arises out of the wrongful actions of Jerrolds (former President and Chief Executive Officer of Central) and Kansas (the company that issued fidelity bond insurance policies to Central). Jerrolds' wrongful actions against Central have resulted in more than $11 million in damages to Central. Kansas issued fidelity bonds to Central in which it agreed to protect Central from and/or reimburse Central for the wrongful actions of its employees, including Jerrolds. After Central discovered Jerrolds' wrongful acts, it promptly reported those acts to Kansas. Since that time, Kansas has failed to pay the claim; failed to promptly investigate the claim; and failed to tell Central when and if it will respond to the claim. It recently notified Central that it was discontinuing its waiver of applicable statutory and contractual limitations on Central's time to sue to enforce the Bond. Central therefore brings

this action against Jerrolds and Kansas to recover the more than $11 million in losses that it has suffered. This case is related to actions brought by Central against Jerrolds and Wilburn Quarries, LLC pending in the Hardin County Chancery Court since May 2012 under Docket Numbers CH-105 and CH-106. Those cases are currently stayed due to the criminal investigation being conducted into Jerrolds' wrong doing as President of Central.

### III. FACTUAL BACKGROUND

10. Kansas issued the following insurance policies to Central: Financial Institution Crime Bond (No. 5020 TN); Check Kiting Fraud Indemnification Policy (No. CK 1131 TN); Internet Banking Theft Catastrophe Bond (No. IB 5039 TN); Directors, Officers, and Employees Indemnity and Bank Lender Liability Policy (No. DL 2542 TN); and Bank Employment Practices Defense Policy (No. ED 5911 TN). Kansas also issued prior and subsequent insurance policies to Central. Central collectively refers to these current, prior, and subsequent policies as the "Bond" and sues on each and every one of them to the extent they are applicable.

11. Central paid premiums to purchase the protection provided by the Bond. At all times material to this Complaint, Central paid the required premiums related to the Bond.

12. Kansas, by issuing the Bond to Central, agreed to pay Central for the damage suffered from wrongful acts of Central's employees, including Jerrolds.

13. Jerrolds became the Chief Executive Officer and President of Central in 1996. He was forced to resign from Central on March 30, 2012, effective April 15, 2012. Jerrolds is no longer employed by Central.

#### LETTERS OF CREDIT

14. Following Jerrolds' resignation from Central on March 30, 2012, effective April 15, 2012, Central received information about letters of credit issued by Jerrolds personally,

which purported to obligate Central. Central did not have knowledge of these purported letters of credit while Jerrolds was still working for Central. Because of the information revealed after Jerrolds' resignation, Central quickly began an in-depth investigation to determine the validity of the purported letters of credit and to determine whether Jerrolds had conducted other wrongful actions. Central timely reported to Kansas its knowledge of the purported letters of credit soon after Central learned of them in compliance with the Bond. Central also timely reported to Kansas about other wrongful acts by Jerrolds it found in its investigation and the costs it incurred because of those wrongful acts.

15. The purported letters of credit that were revealed to Central after Jerrolds' resignation are the subject of the cases now styled *Central Bank v. Chris Jerrolds*, Chancery Court for Hardin County, Tennessee, Docket No. CH-105 and *Central Bank v. Wilburn Quarries, LLC*, Chancery Court for Hardin County, Tennessee, Docket No. CH-106.

16. Jerrolds issued the purported letters of credit contrary to Central's internal policies and procedures and in violation of banking regulations, proper accounting procedures, and law. Jerrolds issued the purported letters of credit on his own behalf, in secret, and without knowledge of Central.

17. After Jerrolds' resignation, Central learned that Jerrolds personally issued a letter of credit for the account of Charles Smith ("Smith") purporting to obligate Central in the amount of $2,000,000.00 to Wayne County Bank ("Wayne"), with Wayne as the beneficiary of that purported Letter of Credit ("2012 Wayne Purported Letter of Credit").

18. The 2012 Wayne Purported Letter of Credit, however, was personally issued by Jerrolds after he resigned from Central. According to Wayne's President, Martin Haggard, Wayne received the 2012 Wayne Purported Letter of Credit from Jerrolds on or about April 5,

2012, which was after Jerrolds already resigned from Central and when Jerrolds was no longer at the bank. The 2012 Wayne Purported Letter of Credit was personally drafted by Jerrolds on April 5, 2012, but was backdated by Jerrolds to March 16, 2012. Jerrolds did not draft the 2012 Wayne Purported Letter of Credit until April 5, 2012, which was 20 days after the March 16, 2012 date listed on the purported letter of credit and after Jerrolds was forced to resign from Central.

19. It appears that Jerrolds also had earlier issued purported letters of credit to Wayne in 2010 and 2011. The Wayne Purported Letters of Credit are not valid or enforceable and were issued outside of Jerrolds' authority and without knowledge or notice to Central. Jerrolds personally issued the Wayne Purported Letters of Credit for his own benefit, for the benefit of Smith and/or his related entities, and with the manifest intent to cause Central to suffer a loss.

20. Central did not have any knowledge or notice of the Wayne Purported Letters of Credit until after Jerrolds resigned from Central on March 30, 2012, effective April 15, 2012. Jerrolds admits that he issued the Wayne Purported Letters of Credit without knowledge or notice to Central.

21. The Wayne Purported Letter(s) of Credit have caused Central to incur significant expenses and costs for litigation and the resolution of claims related to those letters. In compliance with the Bond, Central timely reported to Kansas its knowledge of the Wayne Purported Letter(s) of Credit soon after Central learned of the purported letters. Central also has timely reported to Kansas the status of the consequent litigation and expenses.

22. Upon information and belief, on or about July 25, 2011, Jerrolds personally issued a purported letter of credit for the account of TN AL Materials, Inc., purporting to obligate Central in the amount of $340,000, with Wilburn Quarries, LLC ("Wilburn") as the

beneficiary of that document (the "Wilburn Purported Letter of Credit"). Upon information and belief, this letter was a renewal of a previous letter of credit that was personally issued by Jerrolds in 2010.

23. Central did not have any knowledge or notice of the Wilburn Purported Letters of Credit until after Jerrolds resigned from Central on March 30, 2012, effective April 15, 2012. Jerrolds admits that he issued the Wilburn Purported Letters of Credit without knowledge or notice to Central. Jerrolds personally issued the Wilburn Purported Letters of Credit for his own benefit, for the benefit of Smith and/or his related entities, and with the manifest intent to cause Central to suffer a loss.

24. The Wilburn Purported Letter of Credit has caused Central to incur significant expenses and costs related to litigation of claims involving that letter. Litigation related to that letter is still pending in the case captioned *Central Bank v. Wilburn Quarries, LLC*, Chancery Court for Hardin County, Tennessee, Docket No. CH-106. In compliance with the Bond, Central timely reported to Kansas its knowledge of the Wilburn Purported Letter of Credit soon after Central learned of the purported letter. Central also has timely reported to Kansas the status of the consequent litigation and the costs related to it.

25. Jerrolds also personally issued letters of credit for the account of Tennessee Materials Corp., a Smith related entity, purporting to obligate Central for various amounts, with First Metro Bank ("First Metro") listed as the beneficiary on those purported letters of credit (the "First Metro Purported Letters of Credit"). These purported letters of credit were issued outside of Jerrolds' authority at Central and were issued without notice or knowledge to Central.

7

26. The most recent First Metro Purported Letter of Credit was personally issued by Jerrolds on or about February 17, 2012, for the account of Tennessee Materials Corp., purporting to obligate Central in the amount of $1,783,660.44, with First Metro as the beneficiary.

27. Central did not have any knowledge or notice of the First Metro Purported Letters of Credit until after Jerrolds resigned from Central on March 30, 2012, effective April 15, 2012. Jerrolds admits that he issued the First Metro Purported Letter of Credit without knowledge or notice to Central. Jerrolds personally issued these Purported Letters of Credit for his own benefit, for the benefit of Smith and/or his related entities, and with the manifest intent to cause Central to suffer a loss.

28. The First Metro Purported Letters of Credit caused Central to incur significant expenses and costs related to litigation of claims involving those purported letters of credit.

29. Central timely reported to Kansas its knowledge of the First Metro Purported Letters of Credit soon after Central learned of the purported letters and in compliance with the Bond. Central also has timely reported to Kansas the status of the litigation and the costs related to that consequent litigation.

30. Central also received a letter from an attorney representing Glen Gray demanding payment on a purported letter of credit that was allegedly issued by Jerrolds ("Gray Purported Letter of Credit"). Central had no knowledge or notice of the Gray Purported Letter of Credit until it received the alleged presentment.

31. Central reported to Kansas its knowledge of the Gray Purported Letter of Credit soon after Central learned of the purported letter and in compliance with the Bond.

32. The Gray Purported Letters of Credit caused Central to incur legal expenses and costs related to the investigation of the Gray Purported Letter of Credit.

N JAM01 1337567 v6
2923226-000002 06/18/2014

## OTHER WRONGFUL ACTS

33. Because of its investigation related to the purported letters of credit, Central also has learned of other wrongful acts and defalcations committed by Jerrolds. Jerrolds acted secretly, without knowledge or notice to Central and in breach of his fiduciary duties to Central, for the benefit of himself, Smith, and various entities related to Smith. Jerrolds' personal involvement in Smith's finances ultimately led Jerrolds to take improper actions to protect himself, Smith, the Smith Related Entities and/or other third parties, and with the manifest intent to cause Central to sustain loss. Central timely reported to Kansas each of these issues in compliance with the Bond. These actions include, but are not limited to:

    a. Jerrolds received direct payments from proceeds of loans made to Charles Smith and profits from real estate deals made with Smith. For example, Smith borrowed $185,000 from Wayne County Bank, which was partially collateralized by stock owned by Jerrolds. When the loan proceeds were disbursed, $45,000 from Smith's loan was paid to Jerrolds directly. Jerrolds then used these funds for real estate speculation for which he received a large profit.

    b. Jerrolds originated Central Bank "nominee" loans ostensibly made to individuals related to or associated with Charles Smith, but which actually were for the benefit of Tennessee Materials, a Charles Smith entity. "Nominee" loans are loans made in the name of one party where the funds are actually intended to be used by another party whose identity is not disclosed to the lender. Nominee loans often are entered into to avoid regulatory oversight; to induce a bank to loan money where it otherwise would not have loaned money to the actual undisclosed recipient of the funds; or to defraud a bank in some other way. The nominee loans at issue in this case were of this fraudulent nature and done under false pretenses. Records

9

supplied by Tennessee Materials show that Jerrolds also was aware of nominee loans made by other banks to individuals related to or associated with Charles Smith, but which actually were for the benefit of Tennessee Materials. Included are loans made at Central and other banks in the name of American Coal and Iron, KF Land Company, Charles Smith's children, Seth Smith, Chad Smith, and April Spencer Smith (all persons or entities related to Charles Smith) and/or in the name of Secondary Marketing and/or Glen Gray. The above-described nominee loans at the Bank were made by Jerrolds and for Jerrolds' benefit. Collateral securing at least some of these nominee loans was never perfected, was released, or was otherwise worthless. Jerrolds took these actions for his own benefit and/or for the benefit of third parties and with the manifest intent to cause Central to sustain a loss.

   c. Jerrolds colluded and conspired with Randy Self to commit fraud in order to support real estate speculation for Jerrolds' own financial benefit. Jerrolds directly benefitted from these business interests when Randy Self directly, or indirectly through proceeds of transactions, paid obligations owed by Jerrolds. These misdeeds by Jerrolds have resulted in more than $1.186 million in charge-offs and losses at Central with additional potential exposure that is still being investigated.

   d. Jerrolds provided improper financial benefits to Glen Roger Thompson and Michael Nicholson. Jerrolds personally paid hotel and travel expenses for these individuals, and he may have personally borrowed funds at another financial institution for their benefit. Ultimately, these transactions were for his own financial benefit and/or for the benefit of third parties, but to Central's financial disadvantage and with the manifest intent to cause Central to sustain a loss. Central already has suffered losses of approximately $209,000 as a result of some of these transactions.

N JAM01 1337567 v6
2923226-000002 06/18/2014

e. Jerrolds colluded and conspired with others in a series of banking transactions involving multiple banks to benefit Charles Smith and Tennessee Materials (a Charles Smith related entity). Jerrolds conducted these actions for his own benefit and to receive financial benefits from others involved in these transactions, and/or for the benefit of third parties, with the manifest intent to cause Central to sustain a loss. Jerrolds' multiple wrongful actions have caused significant damage to Central that Central is still investigating and addressing.

f. Jerrolds received payments from Charles Smith before the issuance of the Purported Letters of Credit. Jerrolds received direct personal benefit from his wrongful dealings and defalcations involving Charles Smith, Randy Self, Glen Gray, Chadwick Smith, Tennessee Materials, Glen Roger Thompson, and Michael Nicholson. Jerrolds personally benefitted from these transactions to the detriment of Central and with the manifest intent to cause Central to suffer a loss.

34. Jerrolds' actions, including, but not limited to those described in Paragraphs 13-33 of the Complaint, including its subparts, have caused significant damage to Central.

### CENTRAL'S COOPERATION WITH KANSAS

35. Central timely reported to Kansas the wrongful actions conducted by Jerrolds, including without limitation those described in Paragraphs 13-33 of the Complaint, in compliance with the Bond and soon after learning of them. Central has continued to timely notify Kansas of the issues described in this Complaint and additional issues as they have been discovered.

36. Kansas initially represented to Central that it would investigate Central's claims under the Bond. Kansas also granted Central an extension in writing that allowed Central

11

additional time to file a Proof of Loss with Kansas under the Bond. For example, on October 5, 2012, Kansas granted Central an extension of time to file a Proof of Loss.

37. On or about March 28, 2013, Central timely filed a Proof of Loss that explained in detail Central's losses that related to Jerrolds' wrongful actions. Central filed this Proof of Loss within the time period required by Kansas and within the time period Kansas granted under its extension.

38. Central fulfilled all of the duties after the loss that were imposed upon it by the Bond and/or by Kansas.

### KANSAS'S FAILURE TO PAY

39. Despite the fact that Central fulfilled all duties imposed on it by the Bond and/or by Kansas, and that the losses to Central are the result of covered causes of loss under the Bond, Kansas has wrongfully failed to pay Central's claim. It also recently notified Central that Kansas was discontinuing its waiver of applicable statutory and contractual limits on the time to sue under the Bond.

40. Central has willingly made itself available to Kansas to permit it to conduct an investigation related to Central's Bond claims and has fully cooperated with Kansas's duties to investigate these Bond claims. Kansas nonetheless has failed to promptly investigate Central's Bond claims. Over 15 months have passed since Central timely filed its Proof of Loss. Kansas still asserts that it has not had enough time to investigate Central's claims and apparently has conducted very little investigation into Central's claims. Kansas's actions demonstrate its intent to unduly extend its investigation in an attempt to permit the limitations provisions of the Bond to expire before it completes its investigation and before it even gives Central an answer to its claim.

41. After fifteen months of investigation, Kansas recently notified Central that its investigation was nowhere near complete; that it was not in a position to give Central an answer to its Bond claim; and that it was demanding to take three more formal statements from Central's employees. Kansas failed to give any assurances of when it would complete its investigation or if it would ever complete its investigation.

42. Kansas's slow investigation, its failure to pay Central's claim, and its recent communications have caused Central to seek legal counsel to initiate this litigation to recover insurance proceeds to which it is entitled.

43. Kansas's failure to promptly investigate this claim and its failure to pay money and benefits towards Central's losses constitutes a breach of contract, as set forth more fully herein.

44. Central's right to relief against all Defendants arises out of the same transaction or occurrence, or series of transactions or occurrences. In addition, there are numerous questions of law and/or fact common to all of the parties and the causes of action and defenses pertinent to those parties.

## IV. CAUSES OF ACTION

### CAUSES OF ACTION AGAINST JERROLDS

45. The allegations contained in Paragraphs 1-44 of this Complaint are incorporated herein by reference as if set forth verbatim herein.

46. Jerrolds' acts and failures to act, as described herein and otherwise, were done willfully, intentionally, negligently, grossly negligently, maliciously, wrongfully, with reckless disregard, and with full knowledge that they violated his duties to Central and his obligations as

13

an officer and/or employee of Central, and with the manifest intent to cause Central to sustain a loss.

47. Jerrolds' acts and failures to act, as described herein and otherwise, were done for his own improper benefit; or other person/entities' benefit; to receive improper financial benefits to the detriment of Central; and with the manifest intent to cause Central to sustain a loss.

48. Jerrolds' acts and failures to act, as described herein and otherwise, constituted fraud, deceit, constructive fraud, negligence, gross negligence, breach of fiduciary duty, breach of his duties as an employee and/or officer of Central, and a breach of his employment agreement with Central.

49. Jerrolds' acts and failures to act, as described herein and otherwise have caused damages to Central in an amount not less than $11,000,000.00, and additional amounts to be determined based on Central's further investigation and discovery.

50. Jerrolds' acts and failures to act, as set forth herein and otherwise, support a claim against him in favor of Central for indemnification entitling Central Bank to recover all of its damages, costs, and expenses, including attorney's fees, in an amount not less than $11,000,000, and in amounts to be determined upon Central's further investigation and discovery.

51. Jerrolds' acts and failures to act, as described herein and otherwise, support an order requiring him to refund to Central any compensation he received from Central during the pendency of his disloyal and egregious conduct.

52. Jerrolds' acts and failures to act, as set forth herein and otherwise, merit an award against him for punitive damages.

## CAUSES OF ACTION AGAINST KANSAS

53. The allegations contained in Paragraphs 1-52 of the Complaint are incorporated herein by reference as if set forth verbatim herein.

54. The Bond issued by Kansas to Central is a binding contract, which is supported by valid consideration. Central paid significant premiums to Kansas to receive the protection that Kansas promised by issuing the Bond.

55. Central has fulfilled all of the duties imposed upon it by the Bond and by Kansas. Central has complied with all conditions precedent required to bring this lawsuit.

56. Kansas is in material breach of the Bond and is liable to Central for the maximum amount allowed by the Bond for the losses described herein and otherwise. Kansas's breach includes, but is not limited to:

    a. Kansas has failed to timely and reasonably investigate Central's claim and is prolonging the investigation in an attempt to rely on contractual and/or statutory limitation provisions that might apply to the claim in the future if Central did not file this lawsuit. Kansas's actions and failures to act violate the duty of good faith and fair dealing that are inherent in every contract.

    b. Kansas has failed to timely pay the amounts owed under the Bond and has failed to pay for Central's litigation expenses arising out of Jerrolds' wrongful actions, which are covered by the Bond.

    c. Kansas has failed to consistently and regularly keep communications with Central regarding the status of the claim as would be expected between an insurance company and its insured.

15

57. As a result of Kansas's breach of contract, Central has sustained substantial compensable losses for the amounts claimed by Central under the Bond and otherwise, plus interest thereon, as well as money damages for economic losses, including, without limitation, loss of $11,000,000, loss of reputation in the banking community, and other numerous and assorted incidental and consequential damages.

WHEREFORE, as a result of the foregoing, Central would respectfully request that proper process be issued and served on Defendant Kansas and Defendant Jerrolds, requiring them to answer and/or otherwise respond in the time period required by law, and that this Honorable Court award a judgment against Kansas and Jerrolds as follows:

A. For compensatory damages of not less than $11,000,000;

B. For payment of the maximum amount due under the Bond;

C. For punitive damages against Defendant Jerrolds in the amount of $11,000,000;

D. For pre- and post-judgment interest against both Defendants; and

E. For such other further and general leave as this Court deems just and equitable.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES.

Respectfully submitted,

James A. DeLanis (BPR # 6057)
Joshua A. Mullen (BPR# 28388)
Baker, Donelson, Bearman, Caldwell
& Berkowitz, PC
Baker Donelson Center, Suite 800
211 Commerce Street
Nashville, Tennessee 37201
(615) 726-5613
(615) 744-5613 (facsimile)

*Attorneys for Plaintiff Central*

STATE OF TENNESSEE
DEPARTMENT OF COMMERCE AND INSURANCE
500 JAMES ROBERTSON PARKWAY
NASHVILLE, TENNESSEE 37243

7012 3460 0002 8943 8306

FIRST CLASS



02 1M
0004292626
MAILED FROM ZIPCODE 37243
$07.40
JUN 24 2014

7012 3460 0002 8943 8306
BERKSHIRE HATHAWAY HOMESTATE INS CO.
3333 FARNAM STREET, SUITE 300
OMAHA, NE 68131

6/23/14

REC'D MAIL
JUN 27 2014

Claims?